UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
**alti.ipeku@gmail.com** AND
**benafra8@gmail.com** THAT IS STORED AT
PREMISES CONTROLLED BY GOOGLE
INC.

MAG. No. _____

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Masato T. DiLorenzo, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Google Inc., a provider of e-mail and other internet-related services headquartered at 1600 Amphitheatre Parkway in Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require Google Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2. The information requested in this search warrant is being sought pursuant to a request for assistance ("Request") from the Federal Office of Justice in Bonn, Germany, transmitted to Washington, D.C., on or about October 24, 2017. Authorities in Germany are investigating homicide offenses in violation of the criminal laws of Germany, specifically,

sections 25, 27, and 211 of the Criminal Code of Germany. Copies of the applicable laws are appended to this affidavit.

3. The Request is made pursuant to the Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-F.R.G., Oct. 14, 2003, S. TREATY DOC. NO. 108-27 (2004), as supplemented by the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-F.R.G., April 18, 2006, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Treaty"). Under the Treaty, the United States is obligated to render assistance in response to this Request.

4. I am a Special Agent with the Federal Bureau of Investigation, and have been since July 2005. I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit. My current duties include responding to request from foreign governments pursuant to Mutual Legal Assistance Treaties, including serving as the affiant on search warrants affidavits, serving search warrants, and reviewing the data received for relevance in compliance with parameters of the search warrants. In my past assignments I have conducted investigations of federal criminal violations as well as violations of national security. I have gained experience through various trainings and conferences. I have also worked organized crime, counterintelligence and counterterrorism matters, giving me the extensive experience in the execution of search warrants and analysis of collected evidence.

5. The facts set forth in this affidavit are based upon information conveyed to the United States via a request made pursuant to the Treaty by authorities in Germany and upon my training and experience. This affidavit is intended to show merely that there is sufficient

probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the criminal laws of the Germany have been committed by Altin Ipeku ("Ipeku"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512 . . . ." 18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"), § 3512(c)(3) ("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

8.  This application to execute the Germany's request has been approved and duly authorized by an appropriate official of the Department of Justice, through the Office of International Affairs ("OIA").[1] *See* 18 U.S.C. § 3512(a). An OIA attorney has reviewed the

---

[1] The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters. *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81A and 81B (2015).

request, confirmed that it was submitted by authorities in Germany in connection with a criminal investigation and/or prosecution, and authorized the undersigned to file this application.

## PROBABLE CAUSE

9. According to German authorities, in 2000, a blood feud began between two families in Albania when members of Family 1 killed a member of Family 2. German authorities have indicated that several male members of both families have fallen victim to this blood feud. Most recently, on May 22, 2017, a body was discovered floating on the surface of a lake in Germany. The body was identified as a member of Family 1. An autopsy revealed that the victim had been in the lake for approximately one month and had died from blunt force trauma to the head.

10. Ipeku, a close friend of Family 2, is the primary suspect in the case. Ipeku was first suspected of committing the murder when German authorities discovered WhatsApp communications, occurring in April 2017, between a member of Family 1 and a friend of the victim. The messages stated that Ipeku had been attempting to obtain a photograph of the victim and determine his whereabouts for over a year.

11. Authorities discovered that along with the personal relationship Ipeku shares with Family 2, he also has an outstanding debt of EUR 30,000 owed to two of brothers in Family 2. It was noted that the victim's body was found with EUR 380 in the pocket of his clothing, suggesting that there was a personal motive for the crime.

12. German authorities learned from the victim's family and friends that on April 20, 2017, the victim left his home with the intention of meeting his friend, "Don Marqueshi." Authorities believe that "Don Marqueshi," who was later identified through witness testimony as Alidon Marqueshi ("Marqueshi"), made friends with the victim in order to gain his trust and lure

4

him to Ipeku. From a train card found with the victim's body, authorities discovered that the victim took a train on April 20, 2017, to the town in which his body was later discovered. There is no known connection between the victim and the town to which he traveled.

13. By contrast, there are a number of connections between Ipeku and where the body was found. Through their initial investigation, authorities discovered that Ipeku is a member of a fishing club that operates on two lakes in the area where the victim's body was discovered. Ipeku claimed that he visited the area two to four times between February and July 2017. Authorities found the alleged murder weapon (a hammer) and links from the victim's watch in an area owned by said fishing club, which is only accessible by key entry. Authorities found a key to this area of the fishing club in the suspect's apartment.

14. Authorities confiscated Ipeku's mobile navigation device from his apartment and learned that on April 13, 2017, Ipeku made a trip to the lakes. The same day, Ipeku had a number of telephone communications with a phone number registered to a nonexistent individual. Telephone records for this phone number reveal that it was only registered on April 12 and 13, 2017, and exclusively used to contact Ipeku.

15. Similarly, on April 18, 2017, Ipeku had contact with another phone number registered to a nonexistent person. This number was never used again after April 18, 2017. German authorities have determined that it is highly likely that the materials used to wrap the victim's body were purchased on April 18, 2017, from a specific store. This store is located near where Ipeku lives, and he has been there before.

16. On April 25, 2017, Ipeku drove his car to Albania. He then flew back to Germany on April 28, 2017. Authorities have not been able to recover his car. Notably, Marqueshi travelled to Albania at the same time as Ipeku.

17. Days after news that the victim's body was recovered was published on May 23 and 24, 2017, Ipeku's cell phone was deregistered. The phone has not been recovered.

18. Based on the Ipeku's phone number and IMEI number registered with a German telephone provider between May 23 and May 26, 2017, Ipeku used a Samsung Galaxy S5 mini with an Android operating system (earlier data is not available because of German data storage restrictions). German authorities connected the phone number and IMEI to the Google account alti.ipeku@gmail.com. Google subscriber records for this account show that Ipeku created the account in 2015, logged in on May 20, 23, and 26, 2017, and had enabled Google's Android, Gmail, Google Hangouts, Web & App Activity, and Location History services.

19. German authorities are investigating Ipeku's whereabouts between April 13 and April 28, 2017, as it appears that he may have undertaken reconnaissance and preparatory work prior to the murder and then taken steps to hide or destroy evidence after the murder. Consequently, they request Ipeku's location history for this period. Additionally, because when Web & App Activity is enabled, Google tracks Maps history that the user reviewed, shared, or searched for recently, German authorities also request this information for the relevant period.

20. Authorities did not recover the victim's phone. However, the victim's Facebook account was registered using the e-mail address benafra8@gmail.com and the phone number +4917662262863. Subscriber information for the Google account benafra8@gamil.com showed that the account was created in December 2016. The last login was on April 22, 2017 – two days after the victim was last seen. Google's Android, Location History, and Web & App Activity services were enabled. The fact that Android and Location History were both active indicates that the account was indeed linked to a mobile phone.

21. As the victim was last seen on April 20, 2017, and the Google account was last accessed two days after he disappeared, German authorities request transactional data for his account that may shed light on his activity before he died. Additionally, they request Google Maps history (Web & App Activity) and Location History for the account to further their investigation into where the victim went after he left his apartment on April 20, 2017, and whether he was in the same vicinity as Ipeku.

22. Based on the above information and other available evidence, German authorities have reason to believe that records for the Google account associated with alti.ipeku@gmail.com and benafra8@gmail.com (including records pertaining to use of Android, Web & App Activity, and Location History) will contain evidence of Ipeku's location and activities leading up to and shortly after the murder as well as the victim's last days before he was murdered.

## BACKGROUND CONCERNING GOOGLE

23. In my training and experience, I have learned that Google Inc. provides a variety of on-line services, including e-mail access, to the public. Google Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account(s) listed in Attachment A. Subscribers obtain an account by registering with Google Inc. During the registration process, Google Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google Inc. subscribers) and information concerning subscribers and their use of Google Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

24. A Google Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Google Inc. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

25. The subscriber of a Google, Inc. e-mail account also can sign-up to utilize additional services or functionalities offered by Google, including Google Plus (also referred to as "Google+"), Google Photos, Google Hangouts, Google Chrome Sync, Web & App Activity, Location History, and YouTube.

26. Google Plus is a social networking platform that interfaces with or is otherwise linked to the other Google-based services utilized by a particular Google Inc. subscriber. A Google Plus user will have a publicly visible profile that displays status updates posted by the user and certain other user-populated information about the user, including a "tagline" describing the user, a profile photo, background photo, cover photo, and other details about the user, including the user's birthday, previous work and school history, interests, and places lived. Google Plus users are able to communicate with, "follow" the profiles and activities of, comment on posts made by, and share information posted by, other Google Plus users. A Google Plus user also can elect to display on his or her Google Plus profile links to (a) the user's other social networking profiles or accounts (including those that are non-Google-based), (b) websites for which the user is a contributing author, and (c) links to any other websites that are recommended by the user.

27. Google Hangouts ("Hangouts") allows users to communicate in a variety of ways including by text, voice, and video. A Hangouts user can, among other things, participate in group conversations, share photos, maps, and other media with other users of Hangouts, and place calls to landline, mobile, and internet-based telephone numbers.

28. Google Photos ("Photos") is a digital photograph and video storage area to which a user can upload photos and videos from any platform and categorized these photos and videos into albums, which can then be shared with other Google users.

29. If enabled by the user, Google Chrome Sync enables a user to sync bookmarks, history, passwords, and other settings across various devices when the user is signed into Chrome on more than one device.

30. If enabled by the user, Location History will cause the user's devices to report the approximate geolocation of such devices back to Google over time. This location data is then supplied to any applications (whether Google-based or otherwise) operating on the devices that utilize user location information in order to enhance the applications' services.

31. If enabled by the user, Web & App Activity will save information such as searches in Google products like Google's search engine and Maps. Google will also save information on the device like recent apps or contact names that the user searches for.

32. In my training and experience, internet services and e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under

9

investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

33. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular log-ins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

34. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

35. As explained herein, information stored in connection with an e-mail account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating officials to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with an e-mail account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the e-mail provider can show how and when the account was accessed or used. For example, e-mail providers typically log the IP addresses from which users access the e-mail account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the e-mail account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

11

## **CONCLUSION**

36.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

                                        Respectfully submitted,

                                        Masato T. DiLorenzo
                                        Supervisory Special Agent
                                        Federal Bureau of Investigation

Subscribed and sworn to before me on _____, 2017

_____
UNITED STATES MAGISTRATE JUDGE

## Annex

## Relevant Provisions of Germany's Criminal Code

**Section 25: Principals**

1. Any person who commits the offense himself or through another shall be liable as a principal.

2. If more than one person commit the offense jointly, each shall be liable as a principal (joint principals).

**Section 27: Aiding**

1. Any person who intentionally assists another in the intentional commission of an unlawful act shall be convicted and sentences as an aider.

2. The sentence for the aider shall be based on the penalty for a principal. It shall be mitigated pursuant to section 49 subs. 1.

**Section 211: Murder**

1. The murderer shall be punished with imprisonment for life.

2. A murderer is, whoever kills a human being out of murderous lust, to satisfy his sexual desires, from greed or otherwise base motives, treacherously or cruelly or with means dangerous to the public or in order to make another crime possible or cover it up.

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with **alti.ipeku@gmail.com** and **benafra8@gmail.com** that is stored at premises controlled by Google Inc., a company that accepts service of legal process at 1600 Amphitheatre Parkway in Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures to Facilitate Execution of the Warrant

I. **Information to be disclosed by Google Inc. (the "Provider") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A (the "Account"):

a. All records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the Account was created, the length of service, the IP address used to register the Account, log-in IP addresses associated with session times and dates, for the period from April 12, 2017, to and including April 28, 2017, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

b. All activity logs for the Account and all other documents showing all activity with respect to the Account (including that involving Gmail, Google Plus, Google Hangouts, Google Photos, Google Chrome Sync), for the period April 12, 2017, to and including April 28, 2017, and information about each communication sent or received by the Account for the period from April 12, 2017, to and including April 28, 2017, (not including the contents thereof) including stored or preserved communications sent to and from the Account, the source and destination of the communication (such as source and destination e-mail addresses and telephone numbers),

any IP addresses associated with each communication, the date and time at which each communication was sent, and the size and length of each communication;

    c.    Address books, contact and buddy lists, and calendar data, for the period from April 12, 2017, to and including April 28, 2017; and

    d.    All geolocation records for the Account, for the period from April 12, 2017, to and including April 28, 2017;

    e.    All location information from Google Maps, including data concerning route searches, for the period from April 12, 2017, to and including April 28, 2017;

    f.    The IMEI, MAC address, or other device identifier for each device associated with the Account and each device for which Google Chrome Sync was enabled during the period April 12, 2017, to and including April 28, 2017;

    g.    All records pertaining to communications between the Provider and any person regarding the Account, including contacts with support services and records of actions taken. The Provider shall deliver the information set forth above via United States mail or courier to: Supervisory Special Agent Robert C. Basanez, Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 9664, 935 Pennsylvania Avenue, NW, Washington D.C. 20535-0001

Or email to HQ_ISP_MLAT_Returns@FBI.gov

II. **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of sections 25, 27, and 211 of the German Criminal Code relating to homicide offenses, including, for each account identified on Attachment A, information pertaining to the following matters:

(a) Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account owner;

(b) The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s), particularly during the relevant period; and

(c) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court.